Filed 11/14/11

# IN THE SUPREME COURT OF CALIFORNIA

LOS ANGELES COUNTY    )
METROPOLITAN      )
TRANSPORTATION AUTHORITY, )
            )
   Plaintiff and Appellant,  )
            )      S188128
   v.          )
            )   Ct.App. 2/4 B212643
ALAMEDA PRODUCE MARKET,  )
LLC, et al.,        )   Los Angeles County
            )  Super. Ct. No. BC313010
   Defendants and Respondents. )
_____)

   Under California's "quick-take" eminent domain procedure, a public entity filing a condemnation action may seek immediate possession of the condemned property upon depositing with the court the probable compensation for the property. (*Mt. San Jacinto Community College Dist. v. Superior Court* (2007) 40 Cal.4th 648, 653 (*Mt. San Jacinto*); see also Code Civ. Proc., §§ 1255.010, 1255.410.)[1] Any defendant in the condemnation action — which includes anyone the public entity knows to have or claim an interest in the property (§ 1250.220, subd. (a)) — may apply to the court to withdraw all or any portion of the deposit (§ 1255.210). Section 1255.260 provides that, "[i]f any portion" of the deposit "is withdrawn, the receipt of any such money shall constitute a waiver by operation of law of all claims and defenses in favor of the persons receiving such payment

---

**1**   All further statutory references are to the Code of Civil Procedure.

except a claim for greater compensation." The Court of Appeal in this case held that, under this statute, if a lender holding a lien on condemned property applies to withdraw a portion of the deposit, and the property owner does not object to the application, *the lender's* withdrawal of a portion of the deposit constitutes a waiver of *the property owner's* claims and defenses, except a claim for greater compensation. We find that the Court of Appeal's conclusion is inconsistent with the relevant statutory language and framework. We therefore reverse the Court of Appeal's judgment.

### FACTUAL BACKGROUND

In January 2004, a federal court, to implement a 1996 consent decree requiring improvement in the quality of bus service in Los Angeles, ordered plaintiff Los Angeles County Metropolitan Transportation Authority (MTA) to place an additional 145 buses in service by year's end. To comply with this order, in March 2004, MTA's governing board adopted a resolution of necessity that authorized the taking of property in downtown Los Angeles owned by Alameda Produce Market, Inc. (APMI).[2] One week later, MTA filed a complaint seeking to acquire the property by eminent domain. At the same time, it applied to the court for an order for immediate possession of the property (§ 1255.410, subd. (a)) and deposited $6.3 million with the court as the probable amount of compensation for the property (§ 1255.010, subd. (a)).

On May 20, 2004, APMI filed an amended answer to the complaint raising numerous objections to the proposed taking. It argued in part that MTA's resolution of necessity was invalid because it did not meet the statutory requirements. APMI also objected to MTA's request for an order allowing it to take possession of the property. The court overruled APMI's objection to MTA's request for immediate possession and, on November 24, 2004, MTA took

---

[2]    APMI later filed for bankruptcy and was succeeded in this litigation by Alameda Produce Market, LLC.

possession of the property. In June 2005, after making improvements, MTA began using the property for additional bus and employee parking.

Not long after MTA filed the complaint and deposited probable compensation, three lenders that held liens against the property (Lenders) — VCC Alameda, LLC (VCC Alameda), Namco Capital Group, Inc. (Namco), and California National Bank — applied to the court to withdraw a portion of the deposit.[3] Withdrawal applications are authorized by section 1255.210, which provides in part: "Prior to entry of judgment, any defendant may apply to the court for the withdrawal of all or any portion of the amount deposited."[4] As this section requires, Lenders served copies of their applications on MTA.

MTA objected to the applications under section 1255.230, subdivision (b)(1), which provides that a public agency seeking condemnation may object to a withdrawal application on the ground that "[o]ther parties to the proceeding are known or believed to have interests in the property." MTA's objection triggered section 1255.230, subdivision (c), which provides in relevant part: "If an objection is filed on the ground that other parties are known or believed to have interests in the property, the plaintiff shall serve or attempt to serve on such other parties a notice that they may appear within 10 days after such service and object to the withdrawal." In accordance with this provision, on April 27, 2004, MTA served noticed on APMI of its right to object to the withdrawal applications. The notice advised APMI that its "failure to object" to the applications would "result in

---

[3]    The complaint identified VCC Alameda as the property owner, but that entity had transferred the property to APMI the day before MTA filed the complaint. The complaint erroneously sued APMI as a tenant of the property and identified it as Alameda North Parking, Inc.
[4]    The complaint named VCC Alameda and California National Bank as defendants. Namco joined the action by filing an answer to the complaint as a Doe defendant.

3

waiver of any rights against the plaintiff to the extent of the amount withdrawn." APMI received the notice, but did not file an objection.

MTA later withdrew its objection to the withdrawal applications and, on June 8, 2004, several weeks after APMI filed its amended answer objecting to MTA's right to take the property, signed a stipulation with Lenders agreeing to the withdrawals. The stipulation, which APMI did not sign, stated that APMI was "not objecting to the instant withdrawal of funds." Pursuant to the stipulation, the court granted the withdrawal applications and authorized Lenders collectively to withdraw $6.1 million of the deposit, leaving $200,000 remaining. After using the funds to pay APMI's loans, Lenders filed disclaimers of interest with the court. In October 2004, on APMI's motion, MTA increased the deposit by $2.4 million. APMI has never applied to withdraw any of the deposited funds.

In July 2006, after conducting a bench trial on the merits, the trial court entered an ordering conditionally dismissing MTA's complaint, finding: (1) MTA's resolution of necessity was conditional in that it required MTA to negotiate further with the appropriate defendants on a mutually agreeable parking plan; and (2) MTA failed to engage in meaningful negotiations, rendering the conditional resolution invalid. The trial court ruled that it would dismiss the complaint unless, as the resolution of necessity contemplated, MTA engaged in fully informed, good faith negotiations. In September 2008, after the parties' mutually selected mediator reported that MTA had failed to negotiate in good faith, the trial court entered a final order dismissing MTA's complaint and requiring MTA to relinquish the property to APMI within 90 days.

At the bench trial and during subsequent proceedings, MTA argued that, under section 1255.260, APMI's earlier failure to object to Lenders' withdrawal applications constituted a waiver of APMI's right to challenge the taking, other than the amount of compensation. Although initially declining to address the argument, the trial court ultimately rejected it on its merits, finding that section

4

1255.260 was inapplicable because APMI had committed no affirmative act sufficient to constitute a waiver.

The Court of Appeal reversed, finding that Lenders' withdrawal of funds to satisfy APMI's loan obligations resulted in a waiver under section 1255.260. It relied principally on *Redevelopment Agency of San Diego v. Mesdaq* (2007) 154 Cal.App.4th 1111, 1138-1139 (*Mesdaq*), which found a waiver under section 1255.260 where a property owner, in a filed response to his mortgage lender's withdrawal application, informed the court he was not objecting to the withdrawal request. The Court of Appeal found "no valid basis" for distinguishing *Mesdaq*, noting that APMI had not objected to Lenders' withdrawal application and that the trial court, in granting the applications, had relied on Lenders' representation that APMI did not object. Given its conclusion, the Court of Appeal did not reach the merits of MTA's alternative attacks on the trial court's judgment.

We then granted APMI's petition for review. Shortly before oral argument, the parties notified us they had settled their dispute. Although the appeal is, therefore, now moot as to them, because there has been no request for dismissal and the issue presented is "of continuing public importance," we have elected to retain jurisdiction. (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1202, fn. 8.)

## DISCUSSION

At issue is section 1255.260's proper interpretation. "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." (*People v. Murphy* (2001) 25 Cal.4th 136, 142.) The well-established rules for performing this task require us to begin by examining the statutory language, giving it a plain and commonsense meaning. (*Ibid*.) We do not, however, consider the statutory language in isolation; rather, we look to the statute's entire substance in order to determine its scope and purposes. (*Ibid*.) That is, we construe the words in question in context, keeping in mind the statute's nature and obvious purposes. (*Ibid*.) We must harmonize the statute's various parts by considering it in the

5

context of the statutory framework as a whole. (*Ibid*.) If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history. (*In re Young* (2004) 32 Cal.4th 900, 906.)

The language of the statute at issue here supports APMI's view that Lenders' withdrawal of some of the deposited funds did not, under section 1255.260, constitute a waiver of APMI's right to contest MTA's authority to take the property. As noted above, section 1255.260 provides: "If any portion of the money deposited pursuant to this chapter is withdrawn, the receipt of any such money shall constitute a waiver by operation of law of all claims and defenses in favor of *the persons receiving such payment* except a claim for greater compensation." (Italics added.) "The word 'receive,' in its commonly accepted meaning, carries with it the concept that something has been physically delivered, or placed *in the hands of the recipient*." (*Labarthe v. McRae* (1939) 35 Cal.App.2d 734, 737, italics added; see also *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826 (*Kelsey S.*) ["[o]n its face," statutory phrase "receives the child into his home" "refers to *actual* receipt of the child," and "does not refer either explicitly or implicitly to . . . constructive receipt"].) Moreover, in 1975, when the Legislature passed section 1255.260, a leading legal dictionary similarly defined the word "receive" as "[t]o take into possession and control; accept custody of." (Black's Law Dict. (rev. 4th ed. 1968) p. 1433, col. 2.) In this case, none of the deposited funds were delivered to or placed in the hands of APMI; nor did APMI take possession and control, or accept custody, of any withdrawn funds. Instead, the withdrawn funds were delivered to, and placed in the possession, custody, and control of, Lenders. Thus, APMI was not a "person[] receiving such payment" (§ 1255.260) as those words are commonly understood.

MTA argues otherwise. It asserts that "the plain meaning" of the statutory language may include not only a mortgage lender that "actually withdraw[s] the

6

deposited funds," but also a property owner who does not object to, and "receives the direct benefit of," the withdrawal. In support of this assertion, MTA relies on the fact that section 1255.260 by its terms establishes a waiver as to "persons receiving such payment," not as to "persons withdrawing the money." The Legislature would have used the latter language, MTA argues, had it intended to "limit the reach of [the] statute's waiver to only the withdrawing party." According to MTA, given the language the Legislature chose and the statute's "purpose" – "to prevent owners from having it 'both ways' " – the statute "is most naturally read to prevent owners from *de facto* obtaining the deposit withdrawn by third parties and still challenging the condemnation."

MTA's argument is unpersuasive. Unlike MTA, we find little, if any, substantive difference between the language the Legislature chose — "persons receiving such payment" (§ 1255.260) — and the language MTA concedes would limit the statute's waiver to the withdrawing party — "persons withdrawing the money." In context, the phrase "persons receiving such payment" (*ibid*.) clearly refers to the withdrawing party. Thus, in order to adopt MTA's statutory construction, we would essentially have to insert the words "the benefit of" into section 1255.260 so it would read "in favor of the persons receiving *the benefit of* such payment." "Doing so would violate the cardinal rule that courts may not add provisions to a statute. [Citations.]" (*Kelsey S., supra*, 1 Cal.4th at p. 827 [declining to read " 'receives the child into his home' " as " 'receives or attempts to receive' " the child into his home (italics omitted)].) This rule takes on added significance in this case given that the Legislature, in another section of the statutory chapter that sets forth the quick-take procedure, used precisely the words — "the benefit of" — that MTA asks us to read into section 1255.260. Section 1255.075, subdivision (a), which the Legislature enacted at the same time it enacted section 1255.260, provides that any defendant with an interest in the property to be condemned may move to have funds that have been deposited pursuant to the quick-take procedure invested "for the benefit of the defendants."

" 'It is a settled rule of statutory construction that where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes.' " (*In re Jennings* (2004) 34 Cal.4th 254, 273.)  In light of this rule, the Legislature's omission of the phrase "the benefit of" in section 1255.260 suggests that MTA's construction does not reflect the Legislature's intent.

In addition, MTA's broad reading of section 1255.260 is in tension with the statutory scheme read as whole.  (See *Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 699 [courts "must construe a statute in the context of the entire statutory scheme of which it is a part"].)  According to MTA, although APMI did not itself actually withdraw any of the deposited funds, under section 1255.260, it waived its right to contest the taking by failing to object to Lenders' withdrawal applications.  However, nothing in section 1255.260, on its face, refers to a nonwithdrawing defendant's failure to object.  Moreover, another section of the quick-take statutes — section 1255.230, subdivision (c) — *does* expressly speak to this circumstance.  The quick-take statutes provide that a defendant applying to withdraw deposited funds must serve its application only "on the plaintiff," i.e., the party seeking to take the property; it need not serve any of the other defendants.  (§ 1255.210.)  Section 1255.230, subdivision (c), specifies that a plaintiff who files an objection to the proposed withdrawal "on the ground that other parties are known or believed to have interests in the property" must serve a notice "on such other parties" advising them that they have 10 days to "object to the withdrawal."  It also specifies:  (1) the notice "shall advise such parties that their failure to object will result in waiver of any rights against the

8

plaintiff *to the extent of the amount withdrawn*" [5]; and (2) parties served with this notice "shall have no claim against the plaintiff for compensation *to the extent of the amount withdrawn by all applicants*." (§ 1255.230, subd. (c), italics added.) Thus, through this section, the Legislature has expressly specified that forfeiture of any "claim against the plaintiff for compensation to the extent of the amount withdrawn by all applicants" is both the consequence of a notified defendant's failure to object to a withdrawal application and the *only* consequence that the required notice must identify. Given this provision, MTA's view that section 1255.260 — which on its face says nothing about a defendant's failure to object — implicitly attaches to that omission the additional, far broader consequence of waiving *all* of the property owner's claims and defenses — including the right to object to the taking — is untenable.[6]

In support of its position, MTA relies on *Mesdaq*. There, in response to an eminent domain complaint, a property owner challenged the plaintiff's authority to take his property. (*Mesdaq*, *supra*, 154 Cal.App.4th at p. 1118.) Seven months after the trial court rejected the owner's challenge, the owner's mortgage lender applied to withdraw some of the funds the plaintiff had deposited as probable compensation for the property. (*Id.* at p. 1138.) In a written response filed with the court, the owner stated: (1) the application had " 'no legal basis' " and "violated" the deed of trust on the property and a stipulation between the owner and the lender, "which 'both provide that [the lender] is not entitled to withdraw funds unless the case is settled or goes to judgment' "; (2) despite these circumstances, "he was 'not objecting to the withdrawal of [funds] . . .' to pay off

---

**5** As previously noted, in accordance with this requirement, on April 27, 2004, MTA served APMI with a notice advising it of the withdrawal applications and stating that its "failure to object to said application[s] . . . will result in waiver of any rights against the plaintiff to the extent of the amount withdrawn."
**6** We have found nothing in the relevant legislative history supporting MTA's view.

9

his loan"; and (3) he did, however, object to withdrawal insofar as the lender was seeking funds to pay its attorney fees. (*Id.* at pp. 1138-1139.) "In light of [the owner's] consent to the bulk of [the] request," the trial court authorized the lender to withdraw "the amount of [the lender's] request minus the amount" to which the owner had objected. (*Id.* at p. 1139.) On these facts, the Court of Appeal held that, under section 1255.260, the owner had waived his right to challenge on appeal the plaintiff's legal authority to take his property. (*Mesdaq*, at pp. 1138-1140.) In reaching this conclusion, the court rejected the owner's argument that, because he had not received the withdrawn funds, there was no waiver under the statute *as to him*, reasoning: "We do not believe there is any legal distinction under section 1255.260 between [the lender] and [the owner] with respect to the withdrawal of funds in this case. The money withdrawn was used to satisfy [the owner's] indebtedness to [the lender], resulting in a direct increase in the value of [the owner's] ownership interest in the condemned property, and relieving him of his mortgage obligations and accrual of interest on those obligations. Such a transaction easily constitutes [the owner's] 'receipt of' the money withdrawn from the deposit. (§ 1255.260.) [¶] Further, the payment of [the owner's] indebtedness with the deposit funds was accomplished with [the owner's] explicit consent. [The owner] noted in his pleadings with the court that [the lender] did not have the legal authority to withdraw the . . . deposit, but nonetheless informed the court that he (the rightful owner of the deposit) did not object to [the lender's] withdrawal of the funds for the purpose of satisfying [his] loan obligation. [Citation.] . . . We see no distinction between this scenario — where [the owner] consented to the withdrawal of the deposit by his bank to pay off his loan on the property — and a scenario where [the owner] himself withdrew the deposit and forwarded it to [the lender] for that purpose. In both situations, [the lender] has received the funds from the . . . deposit, and section 1255.260 consequently mandates a waiver of any future objections to the taking." (*Id.* at p. 1140, italics omitted.)

10

For several reasons, we reject MTA's reliance on *Mesdaq*. First, *Mesdaq* is factually distinguishable from the case now before us. As noted above, in reaching its conclusion, the *Mesdaq* court emphasized that the owner there had "explicit[ly] consent[ed]" to his lender's withdrawal request *by filing with the court a written response* "not[ing]" that the lender "did not have the legal authority to withdraw the . . . deposit" (*Mesdaq*, *supra*, 154 Cal.App.4th at p. 1140) — because the owner and the lender had agreed in writing that the lender was " 'not entitled to withdraw funds unless the case is settled or goes to judgment' " (*id.* at p. 1138) — "but nonetheless inform[ing] the court that he (the rightful owner of the deposit) did not object to [the lender's] withdrawal of the funds *for the purpose of satisfying [his] loan obligation*" (*id.* at p. 1140, some italics added). Similar circumstances are absent here; APMI filed no response to Lenders' withdrawal applications and it never represented to the court (or, as far as the record shows, to anyone else) that written agreements precluded withdrawal or that it would waive such agreements *if* Lenders used the withdrawn funds to pay off APMI's loans. Second, the statutory analysis in *Mesdaq* is abbreviated. The opinion contains little examination of the words of the statute, either in isolation or in the context of the entire statutory scheme. In particular, it does not consider that the Legislature, in section 1255.230, subdivision (c), has expressly specified that forfeiture of any "claim against the plaintiff for compensation to the extent of the amount withdrawn by all applicants" is both the consequence of a notified defendant's failure to object to a withdrawal application and the *only* consequence that the required notice must identify. As explained above, given this provision, we find untenable MTA's view that section 1255.260 — which on its face says nothing about a defendant's failure to object — implicitly attaches to that omission

11

the additional, far broader consequence for which MTA argues.  For these reasons, MTA's reliance on *Mesdaq* fails.**7**

MTA also argues that its construction "is beneficial as a matter of public policy," in that it would "promote[] efficiency and protection of public funds by allowing adjudication of right-to-take challenges *before* any withdrawals are approved."  According to MTA, "[i]f the owner objects and the court denies a lender's application for withdrawal pending resolution of a condemning entities' right to take, the law provides for prompt resolution of such challenges."  By contrast, MTA asserts, APMI's interpretation would enable "large commercial property owners [to] us[e] complex business relationships to circumvent section 1255.260."  "For example," MTA explains, "upon notice of an agency's intent to exercise eminent domain, a company holding title to the subject property can transfer it to a related company in exchange for a promissory note and a deed of trust.  By doing so, the 'lender' company may withdraw the deposited funds while the related 'owner' company argues that it has preserved its right to take challenge.  The simple step of requiring the owner to object forecloses such schemes."**8**

---

**7** As noted, *Mesdaq* is factually distinguishable.  We therefore disapprove *Redevelopment Agency of San Diego v. Mesdaq*, *supra*, 154 Cal.App.4th 1111 only to the extent it is inconsistent with our opinion.

**8** Consistent with this argument, in its answer brief, MTA attacks the validity of Namco's loan to APMI, asserting that APMI "used" Namco as "a straw lender to withdraw deposit funds."  In trial briefs it filed in superior court, MTA raised factual questions regarding this loan's validity.  However, the trial court, in ruling for APMI on the merits, made no factual findings on this subject.  MTA did not raise the subject during posttrial proceedings in the trial court or in the opening brief it filed in the Court of Appeal.  Instead, at the hearing in the trial court on MTA's motions for new trial and to set aside the dismissal, MTA agreed with the court that it was "undisputed" the funds "were withdrawn by three lenders of" APMI.  And it stated in its opening brief in the Court of Appeal that one of "the undisputed facts in the record pertaining to the waiver issue" is that " 'funds were withdrawn by three lenders of' " APMI.  Given these circumstances and the

*(footnote continued on next page)*

However, construing section 1255.260 in accordance with its language and the overall statutory framework does not undermine the policy goals MTA has identified. Even under that construction, the statutes place a plaintiff in a better position than a property owner to ensure that courts adjudicate right-to-take challenges *before* granting withdrawal applications. As already explained, under the statutes, only the plaintiff is initially entitled to receive notice of a withdrawal application (§ 1255.210), to file an objection to the application (§ 1255.230, subd. (b)), and to request a hearing on the application (§ 1255.230, subd. (d)); only if the plaintiff files an objection on the ground that other parties are known or believed to have interests in the property do the statutes provide for the owner's receipt of notice and an opportunity to object to the withdrawal (§ 1255.230, subd. (c)).[9]

Also unpersuasive is MTA's argument that its interpretation puts "the obligation to object" where, as a matter of public policy, it belongs: "on the most knowledgeable party," the property owner, that alone "knows whether it would rather oppose any withdrawals and thereby preserve its right-to-take challenge, or whether it would rather waive any such challenges in exchange for receiving the direct benefit of the deposited funds." Where, as here, the owner's answer to the condemnation complaint contests the plaintiff's right to take and the owner does not itself apply to withdraw deposited funds, the plaintiff should have no confusion about whether the owner wants to preserve its right-to-take challenge.

---

*(footnote continued from previous page)*

parties' settlement of the case, we decline to discuss MTA's current attack on the Namco loan's validity.

[9] It may be, as APMI argues, that a plaintiff can further protect public funds by getting the court to require, pursuant to section 1255.240, subdivision (a), the applicant for withdrawal to file an undertaking. (See § 1255.230, subd. (b)(2) [plaintiff may object to proposed withdrawal on the ground that "[a]n undertaking should be filed by the applicant as provided in [s]ection 1255.240 . . ."].) To decide the case before us, we need not determine this question.

13

In any event, this policy argument, like MTA's others, "is best directed to the Legislature, which can study the various policy and factual questions and decide what rules are best for society. Our role here is to interpret the statute[s] [as they are written], not to establish policy. The latter role is for the Legislature." (*Carrisales v. Department of Corrections* (1999) 21 Cal.4th 1132, 1140.) Under the existing statutes, the Legislature has placed the obligation to object to a withdrawal application first and foremost *on the plaintiff*, by providing for initial service of a withdrawal application on *only* the plaintiff (§ 1255.210), specifying that "*the plaintiff* may file objections" to the application within 20 days of service (§ 1255.230, subd. (b), italics added), and making the property owner's right to notice and an opportunity to object dependent *on the plaintiff's* filing of an objection (§ 1255.230, subd. (c)). Whether placing this obligation principally on the plaintiff is, as a matter of public policy, "sufficiently effective is not for us to say. If the Legislature believes it necessary or desirable to impose [a greater obligation on property owners], it can do so. But we believe that had it already intended to do so, it would have used clearer language than that found in" the existing statutes. (*Carrisales*, *supra*, at p. 1140 [construing Gov. Code, § 12940, subd. (h)(1)].)

Moreover, from a policy perspective, we can discern legitimate reasons why the Legislature may have chosen not to make a property owner's failure to object to another party's withdrawal request a waiver of the owner's claims and defenses other than a claim for greater compensation. The statutory scheme contemplates that the defendants in an eminent domain proceeding – e.g., owner, lienholder, easement grantee, tenant – may have distinct interests in the property at issue and affords all such defendants the right to apply for withdrawal. (§§ 1235.125 [" 'interest' includes any right, title, or estate in property"], 1250.220 [complaint shall name as defendants "persons who appear of record or are known by the plaintiff to have or claim an interest in the property"], 1250.230 ["Any person who claims a legal or equitable interest in the property . . . may

14

appear in the proceeding . . . as a defendant"], 1255.050 [leasehold interest], 1255.210 ["any defendant may apply to the court for the withdrawal of all or any portion of the amount deposited"].)  The various defendants may not be aligned in protecting their interests.  (See, e.g., *Pomona College v. Dunn* (1935) 7 Cal.App.2d 227, 241 [discussing "antagonistic" interests of mortgagee and mortgagor in condemnation action].)  As this case illustrates, an owner may have any number of reasons for wanting to retain its property, while a lienholder may have no incentive to contest a proposed taking if the deposited funds cover the lien.  In such a situation, a lender may decide that withdrawing the portion of the deposited funds to which it is entitled serves its own economic interests.  By expressly providing that "the receipt of any such money shall constitute a waiver by operation of law of all claims and defenses in favor of the persons receiving such payment except a claim for greater compensation," section 1255.260, on its face, reasonably ensures that a lender's receipt of deposited funds will cut off its own rights without waiving all rights of an owner that does not apply for a withdrawal and has no control over the actions of a lender with a valid legal claim to a portion of the deposit.  By the same token, section 1255.230 reasonably provides a more limited consequence for an owner that fails to object to a lender's withdrawal application despite notice:  the loss of any "claim against the plaintiff for compensation to the extent of the amount withdrawn . . . ."  (§ 1255.230, subd. (c).)  Although MTA has identified competing policy concerns that may support a different rule, our role as a court is not to " 'sit in judgment of the Legislature's wisdom in balancing such competing public policies.  [Citation.]' "  (*Sunset Sky Ranch Pilots Assn. v. County of Sacramento* (2009) 47 Cal.4th 902, 909.)  Instead, "due respect for the power of the Legislature and for the separation of powers" requires us to "follow the public policy choices actually discernible from the Legislature's statutory enactments."  (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 651.)

Finally, MTA insists that our conclusion is inconsistent with "the rationale" of section 1255.260. Citing *Mt. San Jacinto*, *supra*, 40 Cal.4th 648, MTA asserts that section 1255.260's purpose is to prevent owners from challenging a plaintiff's right to take "while enjoying the benefit of the deposit of probable compensation." According to MTA, to implement this purpose, we must read the statute as precluding owners that "*de facto* obtain[] the deposit" from "still challenging the condemnation."

MTA's argument is unpersuasive. It is true, as MTA observes, that in *Mt. San Jacinto*, we said that " 'it would be inconsistent for [a property owner] to insist on adjudicating the [condemner's] right to take its property, while it enjoys the use and benefit of the probable amount of its just compensation.' " (*Ibid.*) However, in the same paragraph, we also said that, " '[i]n enacting section 1255.260, the Legislature could have reasonably concluded that a condemnee who denies the condemner's right to take should not be able *to withdraw* the probable amount of its just compensation' " and that a condemnee " 'cannot *withdraw* the deposit *and* challenge the right to take.' " (*Mt. San Jacinto*, *supra*, at p. 665, first two italics added.) As explained above, because the interests of a property owner and a lienholder may diverge, valid reasons exist for distinguishing between owners that actually apply for withdrawal of a deposit and owners that fail to file with the court an objection to a lienholder's withdrawal application. Thus, our discussion in *Mt. San Jacinto* – which presented questions regarding the proper date for valuing the condemned property and factually did not even involve a withdrawn deposit – does not warrant construing section 1255.260, notwithstanding its language and the statutory framework, as waiving all defenses and claims of an owner who does not actually withdraw deposited funds but fails to object to withdrawal by its lender.

For the reasons discussed above, we conclude the Court of Appeal erred in holding that, under section 1255.260, APMI waived its right to challenge MTA's

16

authority to take the property by failing to object to Lenders' withdrawal applications.

## DISPOSITION

We reverse the Court of Appeal's judgment and remand the matter for proceedings consistent with this opinion.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
MARCHIANO, J.*

_____
* Presiding Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market
_____

**Unpublished Opinion** XXX NP opn. filed 10/6/10 – 2d Dist., Div. 4
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S188128
**Date Filed:** November 14 , 2011
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** James R. Dunn

_____

**Counsel:**

Andrea Sheridan Ordin, County Counsel, Robert E. Kalunian, Acting County Counsel, Charles M. Safer, Assistant County Counsel, Joyce L. Chang, Principal Deputy County Counsel; Jones Day, Elwood Lui, Brian D. Hershman, Peter E. Davis and Jolene D. Mate for Plaintiff and Appellant.

Woodruff, Spradlin & Smart and M. Lois Bobak for Orange County Transportation Authority as Amicus Curiae on behalf of Plaintiff and Appellant.

Meyers, Nave, Riback, Silver & Wilson, David W. Skinner, Neli N. Palma and Eugenia Amador for League of California Cities, California State Association of Counties, California School Boards Association and its Education Legal Alliance, Association of California Water Agencies, City of Long Beach, Exposition Metro Line Construction Authority and Pasadena Metro Blue Line Construction Authority as Amici Curiae on behalf of Plaintiff and Appellant.

Best Best & Krieger, Kendall H. MacVey, Bruce W. Beach, Steven C. DeBaun and Kira L. Klatchko for Riverside County Transportation Commission as Amicus Curiae on behalf of Plaintiff and Appellant.

Matteoni, O'Laughlin & Hechtman, Norman E. Matteoni, Peggy M. O'Laughlin Gerry Houlihan; Oliver, Sandifer & Murphy, Connie Cooke Sandifer, Cynthia C. Marian; Horvitz & Levy, Curt Cutting; Lesnick Prince and Christopher E. Prince for Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elwood Lui
Jones Day
555 South Flower Street, Fiftieth Floor
Los Angeles, CA  90071-2300
(213) 489-3939

Christopher E. Prince
Lesnick Prince
185 Pier Avenue, Suite 103
Santa Monica, CA  90405
(213) 291-8984

Curt Cutting
Horvitz & Levy
15760 Ventura Boulevard, 18th Floor
Encino, CA  91436
(818) 995-0800