Filed 10/15/21

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SEIU-USWW et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>PREFERRED BUILDING<br>SERVICES, INC.,<br><br>    Defendant and Appellant. | A159790<br><br>(City and County of San<br>Francisco Super. Ct. No. CGC-<br>15-545974) |

A class of janitors (Janitors) were employed by VPM Maintenance Management, LLC (VPM) at a residential complex (the Site). After VPM terminated its janitorial contract with the Site, a successor janitorial contractor (Successor) replaced VPM. Janitors and their union (Union) (collectively, Plaintiffs) sued Successor for failing to retain Janitors under state and local laws. The trial court granted Plaintiffs' motion for summary judgment and awarded attorney fees. We affirm.

BACKGROUND

Janitors worked for VPM providing janitorial services at the Site. The Union was Janitors' elected bargaining representative. In 2014, VPM notified the Union that it was considering terminating its janitorial contract with the Site. In June 2014, VPM and the Union executed an agreement

---

    * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.C–F and II.

1

regarding this potential termination (Termination Agreement). The Termination Agreement provided that, in the event that VPM terminated its janitorial contract with the Site, VPM would offer a specified severance package to employees who executed an agreement stating they were voluntarily resigning and releasing all claims against VPM. The Termination Agreement also included the following: "[N]either the Union nor any bargaining unit employee waives any rights under the Displaced Janitors Opportunity Act to require any successor employer to offer employment to existing employees . . . ."

In February 2015, VPM informed the Union that it was terminating its janitorial contract with the Site effective April 13, 2015. Janitors each signed a separation agreement (Separation Agreement). The Separation Agreements stated the employee was voluntarily resigning; provided lump sum payments based on the employee's years of service; included a release of all claims against VPM; and stated the employee's last day would be April 13, 2015, or earlier at VPM's election.

On April 10, 2015, VPM informed the Union that VPM was electing to move up Janitors' last day pursuant to the Separation Agreements and "today will be everyone's last day."[1] For the following three days, the Site hired another company to provide essential janitorial services; VPM did not provide these services at the Site.

On April 14, 2015, Successor began providing janitorial services at the Site. On that date, Janitors appeared at the Site and asserted their right to retention. Successor did not retain any of the Janitors.

---

[1] VPM nonetheless paid Janitors through April 13, 2015.

In May 2015, Plaintiffs sued Successor, alleging violations of the Displaced Janitor Opportunity Act (Lab. Code,[2] §§ 1060–1065; DJOA), and the Displaced Worker Protection Act (S.F. Police Code, §§3300C.1–3300C.6; DWPA). Multiple motions for summary judgment and/or summary adjudication were filed and denied in whole or in part. In November 2018, Plaintiffs filed a motion for summary judgment, which the trial court granted. The court subsequently awarded attorney fees to Plaintiffs and issued judgment. This appeal followed.

## DISCUSSION

### I. *Summary Judgment*

"An order granting summary judgment is reviewed de novo. [Citation.] As a practical matter, ' "we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." ' [Citation.] A motion for summary judgment is properly granted 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " (*Doe v. Good Samaritan Hospital* (2018) 23 Cal.App.5th 653, 661.)

### A. *Legal Background*

The DJOA "requires contractors who are awarded contracts for janitorial or building maintenance services at a particular site to retain certain employees working for the terminated contractor for a 60-day transition employment period, and to offer those workers continued employment if their performance during the 60-day period is satisfactory. (§ 1061, subds. (b)(1) & (f).) . . . [T]he DJOA requires a terminated contractor

---

[2] All undesignated section references are to the Labor Code.

3

to provide the name, date of hire, and job classification of each employee employed at the site to the successor contractor within three working days after receiving notice that its contract has been terminated. (§ 1061, subd. (a).) [¶] Under the DJOA, an employee of the terminated contractor who was not offered employment by the successor contractor may sue the successor for back pay, including the value of any lost employment benefits. (§ 1062, subd. (a).) If the employee is the prevailing party, the trial court 'shall award the employee reasonable attorney's fees and costs as part of the costs recoverable.' (§ 1062, subd. (c).)" (*Jones v. Quality Coast, Inc.* (2021) 62 Cal.App.5th 372, 379–380 (*Jones*).)[3]

The DWPA similarly provides that persons employed under service contracts shall be retained by a successor contractor for a 90-day transition period. (S.F. Police Code, §§ 3300C.1(c) & (f), 3300C.2(b).)[4]

B.   *Employees*

Successor argues Janitors were not "employees" within the meaning of the DJOA and DWPA. " 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] The well-established rules for

---

[3] In a footnote, Successor cursorily asserts the DJOA does not apply because VPM terminated the contract, not the Site. The contention is forfeited: "An appellant cannot bury a substantive legal argument in a footnote and hope to avoid waiver of that argument." (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 419.)

[4] The DJOA was modeled on local ordinances adopted in various cities, including San Francisco—presumably, the DWPA. (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 20 (2001–2002 Reg. Sess.) as amended Sept. 4, 2001, p. 3 ["SB 20 is modeled after local ordinances adopted by San Francisco in 1998, Washington, D.C., in 1994, and, most recently, in Philadelphia, Pennsylvania"].)

4

performing this task require us to begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language in isolation; rather, we look to the statute's entire substance in order to determine its scope and purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the statute's nature and obvious purposes. [Citation.] We must harmonize the statute's various parts by considering it in the context of the statutory framework as a whole. [Citation.] If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history." (*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1106–1107.)

The DJOA defines "employee" as "any person employed as a service employee of a contractor or subcontractor who works at least 15 hours per week and whose primary place of employment is in the State of California under a contract to provide janitorial or building maintenance services." (§ 1060, subd. (c).) The DWPA provides a similar definition; the only differences are not material here. (S.F. Police Code, § 3300C.1(c) [" 'Employee' means any person employed as a service employee of a contractor or subcontractor who works at least 15 hours per week and whose primary place of employment is in the City and County of San Francisco under a contract to provide security services, janitorial services, or building maintenance services for the awarding authority."].) Under the DJOA, a successor contractor is required to retain "employees who have been employed by the terminated contractor or its subcontractors, if any, for the

5

preceding four months or longer at the site or sites covered by the successor service contract . . . ." (§ 1061, subd. (b)(1).) The DWPA imposes a nearly identical requirement, but requires retained employees to have been employed for at least the preceding eight months. (S.F. Police Code, § 3300C.2(b) [successor contractor must retain "employees who have been employed by the terminated contractor or its subcontractors, if any, for the preceding eight months or longer at the site or sites covered by the contract"].)

Plaintiffs suggest the statutes require retention of any person "recently or lately" employed by the terminated contractor. This argument is fatally undermined by another provision, requiring the terminated contractor to provide information about "each employee employed at the site or sites covered by the terminated service contract *at the time of the contract termination.*" (§ 1061, subd. (a)(1), italics added; see S.F. Police Code, § 3300C.2(a) [terminated contractor must provide information about "each employee employed at the site or sites covered by the prospective contractor *at the time of contract termination*" (italics added)].) Similarly, the DJOA's formula for calculating a backpay award incorporates "[t]he final regular rate of pay received by the employee *at the time of termination of the predecessor contract* . . . ." (§ 1062, subd. (a)(2), italics added.) This language makes it clear that the individual must be an employee at the time of contract termination.

Successor argues the time of contract termination was April 13, 2015, relying on a declaration from VPM's president averring that "[o]n April 13, 2015, VPM terminated" its janitorial contract with the Site. However, the undisputed evidence establishes that after April 10, 2015, VPM did not provide janitorial services at the Site. No VPM employees provided these

6

services. VPM also did not provide these services through other means; instead, the Site itself hired a third company to provide janitorial services between April 10 and April 14, the date Successor began providing janitorial and maintenance services at the Site. April 10, 2015 was thus the last day VPM provided janitorial services at the Site, either with its own employees or by some other means.

We must determine whether "the time of contract termination" for purposes of the DJOA and DWPA is the nominal last day of the contract or the last day the terminated contractor actually provides janitorial services at the site. The statutory purpose informs our analysis. " 'When construing the Labor Code . . . , we adopt the construction that best gives effect to the purpose of the Legislature . . . . [Citations.] Time and again, we have characterized that purpose as the protection of employees—particularly given the extent of legislative concern about working conditions, wages, and hours when the Legislature enacted key portions of the Labor Code. [Citations.] In furtherance of that purpose, we liberally construe the Labor Code . . . to favor the protection of employees.' " (*Troester v. Starbucks Corp.* (2018) 5 Cal.5th 829, 839.) This employee-protective purpose is confirmed by the legislative history of the DJOA, which "indicates it was designed to protect vulnerable janitorial workers from a labor market in which they can lose their jobs with little or no warning." (*Jones, supra,* 62 Cal.App.5th at p. 380, fn. 3.)[5]

In addition, the DJOA includes provisions indicating a legislative intent to forestall contractors and awarding authorities from circumventing its provisions. The statute defines " 'Successor service contract' " to mean "a service contract for the performance of essentially the same services as were

---

[5] The parties do not suggest the purpose of the DWPA is any different.

previously performed pursuant to a different service contract at the same facility that terminated within the previous 30 days." (§ 1060, subd. (g).) However, in an apparent recognition that contractors and awarding authorities might wait 31 days to begin a new contract to avoid the statute's requirements, the DJOA further provides, " A service contract entered into more than 30 days after the termination of a predecessor service contract shall be considered a 'successor service contract' if its execution was delayed for the purpose of avoiding application of this chapter." (§ 1060, subd. (g).)

To allow a terminated contractor to stop providing services a few days before the nominal end of the contract and claim it therefore had no employees "at the time of contract termination" would create an easy way around the requirements of the DJOA and DWPA. Such an interpretation would contravene the legislative intent to close such loopholes, the worker-protective statutory purpose, and our obligation to liberally construe the statutes in favor of employee protection. Accordingly, we conclude that April 10, 2015—the last day VPM provided janitorial services at the Site—was "the time of contract termination" for purposes of the DJOA and DWPA, regardless of any other nominal or technical contract end date. Janitors were therefore employees at the time of contract termination.

Our analysis is not impacted by Janitors' statements in the Separation Agreements that they voluntarily resigned. Setting aside the question of whether their departure is accurately characterized as voluntary (see Cal. Code Regs., tit. 22, § 1256–1, subd. (d) [for purposes of unemployment benefits, "An employee who leaves work when asked by the employer to either resign or be fired . . . has not left work of his or her own free will," and is therefore "involuntarily unemployed"]), Janitors' resignations were

effective at the end of the day on April 10, 2015.  Therefore, Janitors were still employees at the time of contract termination.

Successor also makes much of Janitors' receipt of severance packages from VPM.  We fail to see how this severance—received by Janitors in exchange for their release of all claims against *VPM*—impacts our interpretation of *Successor's* obligations under the DJOA and DWPA.  Nor are we persuaded by Successor's argument that, if we affirm the trial court, a janitor and terminated contractor could never "voluntarily sever their employment relationship . . . without triggering a retention obligation for the successor."  Most obviously, a janitor could waive his or her rights under the DJOA or DWPA.[6]

C.    *Preemption*

Successor argues Plaintiffs' claims are preempted by section 301 of the Labor Management Relations Act of 1947 (29 U.S.C. § 185; Section 301).  We disagree.

Section 301 " 'provides federal court jurisdiction over controversies involving collective-bargaining agreements . . . .' " (*Balcorta v. Twentieth Century-Fox Film Corp.* (9th Cir. 2000) 208 F.3d 1102, 1107.)  As relevant here, if the right underlying the state law cause of action is " ' "substantially dependent on analysis of a collective-bargaining agreement" ' . . . , the state law claim is preempted by § 301." (*Kobold v. Good Samaritan Regional Medical Center* (9th Cir. 2016) 832 F.3d 1024, 1032–1033.)  However, " 'a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law.' [Citation.]  In other words, '[i]f the *claim* is

---

[6] In the unpublished portion of the opinion, we reject Successor's argument that Janitors so waived these rights.  (See *post,* part I.E.)

9

plainly based on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense.' " (*Id.* at p. 1033.)

Successor argues Plaintiffs' claims are dependent on the Termination Agreement negotiated by VPM and the Union because: (1) Janitors cannot be "employees" within the meaning of the DJOA and DWPA because they resigned; (2) therefore, Janitors must rely on the reservation of rights in the Termination Agreement to pursue their DJOA and DWPA claims; and (3) the reservation of rights applies to "existing employees," the meaning of which is disputed by VPM and Plaintiffs. Successor's argument fails at the first step: as explained *ante,* part I.B, Plaintiffs were employees within the meaning of the DJOA and DWPA, without needing to rely on the Termination Agreement. To the extent interpretation of the Termination Agreement is required by Successor's defenses, preemption does not result. (*Kobold, supra,* 832 F.3d 1024 at p. 1033.)

D.    *Cause*

The DJOA provides a successor contractor is excused from the retention obligation if it "has reasonable and substantiated cause not to hire a particular employee based on that employee's performance or conduct while working under the terminated contract." (§ 1061, subd. (b)(1).) The DWPA similarly provides. (S.F. Police Code, § 3300C.2(e) [successor contractor may terminate retained employee for "cause"].)

Successor argues Janitors' conduct of resigning provided such cause. We disagree. Successor's argument appears to be that Janitors' resignations constituted "cause" because they rendered them no longer employees for whom retention was required under the DJOA and DWPA. We have rejected this argument (see *ante,* part I.B).

10

E.      *Waiver and Estoppel*

Successor argues there are material issues of fact as to whether Janitors waived their right to retention under the DJOA and DWPA or are estopped from asserting such rights.  Again, we disagree.[7]

" ' "[W]aiver" means the intentional relinquishment or abandonment of a known right.'  [Citations.]  Waiver requires an existing right, the waiving party's knowledge of that right, and the party's 'actual intention to relinquish the right.'  [Citation.]  ' "Waiver always rests upon intent." '  [Citation.]  The intention may be express, based on the waiving party's words, or implied, based on conduct that is ' "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' "  (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475.)  "The elements of equitable estoppel are '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.  [Citation.]'  [Citation.]  The detrimental reliance must be reasonable.' "  (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.)

To the extent that Janitors' resignations suggest an intent to waive their rights under the DJOA and DWPA, the express reservation of rights in the Termination Agreement creates the inescapable inference that Janitors did not so intend.  Similarly, for purposes of estoppel, to the extent there is a dispute of fact as to whether Janitors intended their resignations to indicate

---

[7] Because we reject the arguments on the merits, we need not decide whether, as Plaintiffs contend, Successor abandoned the defense of waiver and/or improperly pled the defense of estoppel.

11

they had no rights under the DJOA and DWPA, or whether Successor had a right to so believe, the express reservation of rights in the Termination Agreement is irrefutable evidence that Janitors sought to disabuse VPM (and anyone VPM communicated with) of this notion.  In addition, on the first day of Successor's contract for janitorial services, Janitors appeared at the Site and expressed their understanding that they were entitled to retention.

Successor argues the Termination Agreement's reservation of rights does not apply because Janitors were no longer "existing employees" after their resignations.  Such a construction of the Termination Agreement would be absurd: retention rights would be reserved for bargaining unit members who did not resign, and therefore had no need to reserve their rights, while retention rights would not be reserved for bargaining unit members who did resign.  Instead, the plain meaning of "existing employees" is those bargaining unit members still employed by VPM at the time of contract termination.[8]

Successor notes the trial court's order did not expressly address the waiver defense and argues we should remand for that reason alone.  (See *Main Street Plaza v. Cartwright & Main, LLC* (2011) 194 Cal.App.4th 1044, 1047 [where the court's minute order, the hearing transcript, and the formal order all failed to address certain issues raised in summary judgment motion, "[t]he appellate record does not provide sufficient information to permit meaningful appellate review of these issues"].)  But the court's order did address the merits of the estoppel defense, and Successor itself asserts that " '[e]stoppel is, for practical purposes, indistinguishable from the doctrine of

---

[8] Although the reservation of rights in the Termination Agreement only identifies the DJOA, not the DWPA, Successor does not contend that our analysis is any different for the two statutes.

implied waiver through conduct.' " (Quoting *Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1190.) The record therefore permits meaningful appellate review.

F. *Impossibility*

Successor argues it was impossible to comply with the DJOA and DWPA. " 'The law never requires impossibilities.' (Civ. Code, § 3531.) Impossibility means not only strict impossibility but also impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved. [Citation.] Consistent with this maxim, the law recognizes exceptions to statutory requirements for impossibility of performance." (*Board of Supervisors v. McMahon* (1990) 219 Cal.App.3d 286, 299–300.)

Successor argues it was impossible to comply with any obligations under the DJOA and DWPA because it was told by the Site there were no employees, and neither the Site nor VPM provided it with a list of employees. However, on Successor's first day at the Site, Janitors personally appeared and asserted their status as employees of the terminated contractor. Thus, at the latest by its first day on the job, Successor knew there may have been employees covered by the DJOA and DWPA, and further knew or could easily obtain the identity of such employees. There is no evidence that Successor's compliance with the statute was impossible.

II. *Attorney Fees*

Successor challenges the amount of attorney fees awarded Plaintiffs. Plaintiffs requested lodestar fees with a multiplier of 2.0. The trial court awarded the requested lodestar fees but with a 1.4 multiplier.

"We review attorney fee awards on an abuse of discretion standard. 'The "experienced trial judge is the best judge of the value of professional services rendered in his [or her] court, and while his [or her] judgment is of

13

course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' [Citation.] 'Fees approved by the trial court are presumed to be reasonable, and the [appellant] must show error in the award.' " (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488.)

A.    *Downward Adjustment*

Successor argues the lodestar should have been adjusted downward because Plaintiffs overstaffed the case with eight attorneys.  The trial court addressed this contention in its order: "While [Successor's] concern regarding overstaffing is not misplaced, given that Plaintiffs seek to recover for time expended by eight attorneys on the case, Plaintiffs' showing establishes (1) that five of those attorneys who were principally involved in the case, lead counsel and four associates, account for over 90 percent of the hours worked on the litigation; (2) that Plaintiffs have excluded the time of any attorneys who billed less than 10 hours on the case; and (3) that Plaintiffs, in an exercise of billing judgment, applied an across-the-board 10 percent reduction of their total lodestar . . . .  Based on those adjustments, the Court finds, based in part on its familiarity with the most recent year or so of the litigation, that the overall amount of time for which counsel seek compensation is reasonable in light of the factual and procedural complexity of the case, which included a TRO request, discovery, five motions for summary judgment/summary adjudication by both parties, a contested motion for class certification, and a petition for writ of mandate in the Court of Appeal."  (Record citations omitted.)

Successor does not dispute any of the showings identified by the trial court, but instead generally argues Plaintiffs failed to support staffing the case with so many attorneys.  Successor's assertion is refuted by the trial court's analysis.  The authority relied on by Successor is inapposite.  (*Thayer*

14

*v. Wells Fargo Bank, N.A.* (2001) 92 Cal.App.4th 819, 840–844 [award of requested lodestar fees reversed where attorney: filed last of five nearly identical class action lawsuits; after the lawsuits were coordinated, let attorneys for other class actions take the lead; and regularly appeared at hearings with a second attorney to simply express their concurrence with the other class action attorneys]; *Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 262 [fee award for trustee reversed where "[e]ight attorneys from three major law firms comprised the former trustee's legal team, with four to five of those attorneys simultaneously appearing at the 14–day court trial"].) Successor has failed to demonstrate the trial court abused its discretion.

B.      *Improper Double Counting*

Successor contends the trial court improperly double counted the attorneys' skill by relying on it to enhance the fee award when it was already encompassed by the lodestar.

A lodestar fee may be enhanced "based on factors including . . . (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.) With respect to counsel's skill, "that factor necessarily is reflected in the lodestar figure. The more skillful and experienced the attorney the higher his or her hourly charges will be. It follows that the skill of an attorney will justify enhancing the lodestar figure only if the skills exhibited are beyond those that might be expected of attorneys of comparable expertise or experience." (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1176; see also *Ketchum,* at p. 1132 [adjustment warranted where litigation "required extraordinary legal skill

15

justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services"].)

The trial court identified four factors warranting a multiplier of 1.4. (See *post,* part II.C.) One of these factors was counsel's representation "resulting in a rare summary judgment in favor of a plaintiff class . . . ." The trial court thus impliedly found Plaintiffs' counsel exhibited skill beyond that expected of comparable attorneys. Successor's disagreement with this assessment does not demonstrate the trial court abused its discretion or improperly double counted counsel's skill.

C.    *Multiplier*

With respect to the multiplier, the trial court's order provides: "[T]he Court concludes that a multiplier of 1.4 is the appropriate multiplier in light of the following factors, among others: (a) While Plaintiffs are correct that the issues presented by the case were novel in that there was no binding precedent construing either of the statutory schemes involved, Plaintiffs also acknowledge that '[t]he basic material facts in this matter were largely undisputed from the start of the litigation.' Discovery, while thorough, was not extraordinarily extensive; only three persons were deposed. The case involved primarily issues of statutory interpretation, and therefore was susceptible to resolution by summary judgment. (b) Plaintiffs' representation was indisputably competent and ultimately successful, resulting in a rare summary judgment in favor of a plaintiff class, albeit for substantially less damages than Plaintiffs originally sought. It also included some unsuccessful efforts, including a second motion for summary judgment filed to correct evidentiary deficiencies in their first motion and an unsuccessful opposition to a motion to amend, and at times involved substantial delays. (c) Plaintiffs have shown that the nature of the litigation precluded other employment by

16

the attorneys. (d) The fee was entirely contingent, in that Plaintiffs would not have been entitled to recover fees unless they prevailed in the litigation. (Although Defendants are correct that Plaintiffs' supporting declaration does not address this factor, the Court can reasonably infer it from the circumstances of the class members.)" (Record citations omitted.)

" 'There is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation.' [Citation.] There are numerous such factors, and their evaluation is entrusted to a trial court's sound discretion; any one of those factors may be responsible for enhancing or reducing the lodestar." (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 947.)

Successor argues the trial court relied on Plaintiffs' "counsel's skill but provided no reasoning for *why* [Plaintiffs'] counsel's skill was extraordinary." As noted above, the trial court found counsel achieved a rare result. In any event, the trial court was "not required to explain how it calculated that factor, and we will generally presume the attorney fee award was correct ' "on matters as to which the record is silent." ' " (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 584.)

Successor also challenges the trial court's reliance on an "unsupported" assertion that the litigation precluded other employment and the court's failure to consider the resources of the Union in determining that the fee was contingent. We need not consider these factors because the multiplier is supported by the other factors relied on by the trial court. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1252 ["[w]e need not consider the first factor because the second and third factors alone support a multiplier"].)

17

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

_____

Simons, Acting P. J.

WE CONCUR:


_____

Needham, J.


_____

Burns, J.


A159790

## SEIU-USWW et al. v. PREFERRED BUILDING SERVICES, INC.

(A159790)

Trial Court:                City and County of San Francisco

Trial Judges:           Hon. Harold Kahn; Hon. Ethan P. Schulman

Attorneys:

Greenberg Traurig, Karin L. Bohmholdt, Charles Birenbaum, Jamie Rich, and Tayanah Miller for Defendant and Appellant.


Weinberg, Roger, & Rosenfeld, Antonio Ruiz, Jannah V. Manansala, Alexander S. Nazarov and Caitlin Gray for Plaintiff and Respondents.