Filed 11/9/21

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| D.C.,<br><br>  Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SONOMA COUNTY,<br><br>  Respondent;<br><br>THE PEOPLE,<br><br>  Real Party in Interest. | A162937<br><br>(Sonoma County<br>Super. Ct. No. 38997J,<br>J-38997-02, SCR7432051) |

  In 2020, a juvenile wardship petition was filed charging D.C. (Petitioner) with committing a murder in 2016, when he was 16 years old. The People filed a motion to transfer Petitioner from juvenile court to a court of criminal jurisdiction (Welf. & Inst. Code, § 707, subd. (a)(1))[1] and, following an evidentiary hearing, the juvenile court ordered Petitioner transferred. Petitioner filed the instant petition for writ of mandate challenging the transfer order. We deny the petition.

---

  \* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and IV.

  [1] All undesignated section references are to the Welfare and Institutions Code.

" '[W]hen a minor has been charged in the juvenile court with any felony allegedly committed when he or she was 16 years of age or older'—as [Petitioner] was—'the prosecutor "may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction." ' [Citation.] Upon receiving a transfer motion, the juvenile court is required to 'order the probation officer to submit a report on the behavioral patterns and social history of the minor.' (§ 707, subd. (a)(1).) In addition to the transfer report, the court may consider 'any other relevant evidence that the [prosecutor] or the minor may wish to submit.' (§ 707, subd. (a)(3).) 'The prosecution bears the burden of establishing by a preponderance of the evidence [that] the minor is not a suitable candidate for treatment under the juvenile court system.' [Citation.] 'Whether the youth committed the act alleged in the petition is not the issue in such a determination; the sole question is whether he [or she] would be amenable to treatment in the event that he [or she] is ultimately adjudged a ward of the court.' " (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 185–186, fn. omitted (*Kevin P.*).)

"In ruling on a transfer motion, the juvenile court must consider five criteria under section 707: (1) '[t]he degree of criminal sophistication exhibited by the minor'; (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction'; (3) '[t]he minor's previous delinquent history'; (4) the '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor'; and (5) '[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor.' (§ 707, subd. (a)(3)(A)–(E); see [Cal. Rules of Court,[2]] rule 5.770(b)(2).) 'The weight to be given [to] each of these factors is within the court's discretion'

---

[2] All undesignated rule references are to the California Rules of Court.

[citation], as '[n]othing in section 707 indicates that the . . . court [is] required to give equal weight to each of the five criteria or that it would necessarily be an abuse of discretion to find that one criterion outweighed the other criteria.' " (*Kevin P., supra,* 57 Cal.App.5th at p. 186.)

## FACTUAL AND PROCEDURAL BACKGROUND

*2016: Homicide and Initial Investigation*

On October 17, 2016, the victim, K.K., left his home on his bicycle and never returned. On November 2, his body was found in a shallow grave in a wooded area. He had died from multiple stab wounds to his head and torso.

A search of K.K.'s social media and phone records revealed that on the morning of October 17 he received a social media message from someone with the username "D[.]70707." On November 30, 2016, police interviewed Petitioner. Petitioner initially claimed he had not used that social media application in years and had not spoken to K.K. in some time, but after police showed him the October 17 message, Petitioner admitted having exchanged messages with K.K. that day under the username "D[.]70707." Petitioner said they had arranged to meet so Petitioner could sell K.K. drugs. Petitioner denied any involvement in K.K.'s death.

Police also searched Petitioner's home on November 30. They found several notebooks in Petitioner's room. The notebooks contained writings about violence and Satan: for example, "im a satanic killer;" "your body fall as you hear satans call;" "your blood up on the wall ill drag your body down the fucking hall;" "Im gone aim for your neck;" "I just wanna fucking die;" "ill put yo body in a grave;" "i fantasize about death thats how i unwind;" "I sliced his neck []looked in his eyes told him i was the devil;" "devil got my soul."[3] Many

---

[3] We quote verbatim from Petitioner's writings.

3

of the writings rhymed and appeared to be rap lyrics. Some of the pages included the victim's first name.

*2017–2018: Burglary and DJJ Commitment*

Almost a year later, in September 2017, Petitioner was arrested for an unrelated incident. Petitioner had broken into a home and pointed a knife at a 17-year-old girl hiding in the bathroom. Petitioner was arrested trying to flee the house. He admitted breaking into the house and admitted the knife was his. He told police he was a former "Satanist" and committed the home invasion because he had " 'snapped' " and " 'turned back to [his] sin.' " Police searched Petitioner's home again and found more notebooks containing writings referring to violence and Satanism, including one page with fingerprints in Petitioner's blood.

In September 2017, a wardship petition was filed alleging Petitioner committed burglary (Pen. Code, § 459), assault with a deadly weapon (*id.*, § 245, subd. (a)(1)), and other crimes.[4] The juvenile court sustained the burglary and assault allegations and, in March 2018, committed Petitioner to the Division of Juvenile Justice (DJJ).[5]

*2018: Continued Homicide Investigation*

In July 2018, police learned that K.K.'s DNA was recovered from the knife used by Petitioner in the 2017 burglary.

In September 2018, police searched Petitioner's DJJ cell and found more writings related to violence and Satanism, including: "I am the wicked I

---

[4] Three psychologists examined Petitioner after a doubt regarding his competency was raised. One found him incompetent; the other two found him competent. Petitioner submitted these reports in the transfer hearing.

[5] This court affirmed the disposition. (*In re D.C.* (Feb. 6, 2019, A154357) [nonpub. opn.].)

am the goat I am the killa I will slit yo throught" and multiple repetitions of "666." The writings included two references to K.K.'s name.

Also in September 2018, police interviewed a friend of Petitioner's who told the police he saw Petitioner with what he thought was K.K.'s bicycle soon after K.K. was reported missing.

In December 2018, Do.C., a former DJJ inmate who had been housed near Petitioner, contacted the police after committing a robbery. Do.C. told police Petitioner had confessed to murdering K.K. Do.C. provided details about K.K.'s death that were not publicly known. According to Do.C., Petitioner met with K.K. to sell him marijuana and, when K.K. was urinating, Petitioner attempted to cut his throat.[6] Petitioner then stabbed K.K. six or seven times, hit him in the head, and buried him in a grave that Petitioner dug the day before. Do.C. also said Petitioner was scared because police had the knife he used to stab K.K. Do.C. said Petitioner wanted to kill again soon. Do.C. gave the police a notebook with Petitioner's writings. The writings again included references to Satan, violence, and K.K.'s name, including: "I dont like worshiping satan but thats what happens when you dance with the devil on a cold cell block;" "their going to take me to court very soon and I might just conffess then slit my throught;" "666;" "I had this reacuring dream were im laughing at a murder scene."

*2020: DJJ Discharge; Murder Petition; Transfer Hearing*

In February 2020, over the district attorney's opposition, DJJ granted Petitioner discharge.

In March 2020, before Petitioner was discharged, the People filed a juvenile petition alleging Petitioner, now 20 years old, murdered and robbed

---

[6] K.K.'s body was found with his pants partly pulled down and his penis exposed through the opening in his boxers.

5

K.K. in 2016 (Pen. Code, §§ 187, subd. (a), 211).  The petition specially alleged Petitioner killed K.K. while lying in wait and in the commission of a robbery (Pen. Code, § 190.2, subds. (a)(15) & (17)); personally used a deadly and dangerous weapon (*id.*, § 12022, subd. (b)(1)); and personally inflicted great bodily injury during the robbery (*id.*, § 12022.7, subd. (a)).

The People filed a motion to transfer Petitioner to a court of criminal jurisdiction.  Petitioner opposed transfer and requested a hearing to determine whether the People established a prima facie case.  The juvenile court received a juvenile transfer of jurisdiction report from the probation department (§ 707, subd. (a)(1)) and held a combined transfer and prima facie hearing over multiple days in November and December 2020.[7]

*Probation Report*

The probation officer's report recommended Petitioner be transferred. It reviewed the five statutory factors relevant to the determination.

The report found Petitioner exhibited criminal sophistication by successfully hiding the knife used in the crime and later using it in another crime, attempting to conceal K.K.'s body by burying it in a secluded area, and apparently planning the crime in advance.  Other 16-year-old offenders with similar histories "will not involve themselves in homicidal conduct."

With respect to Petitioner's likelihood of rehabilitation, the report noted Petitioner was 20 years old and juvenile court jurisdiction could extend to his 25th birthday.  The report stated it was difficult to predict how he may mature in the next five years.

---

[7] In addition to the evidence set forth below, the investigating officer testified to the circumstances of K.K.'s murder and the subsequent investigation as recounted above.

The report found Petitioner's delinquent history included a 2014 wardship referral for battery involving a physical fight at school. Petitioner also had "a pattern of delinquency" at school including inappropriate language and behavior, fighting with students and staff, disrupting class, threatening students, and theft, and had been suspended from school six times. Petitioner admitted abusing alcohol, marijuana, and Xanax.

As for prior attempts at rehabilitation, the probation report stated there had been no formal rehabilitation attempts before the alleged offenses. Petitioner was referred to mediation after the 2014 battery, but he refused to participate.

Finally, the report stated the circumstances and gravity of the alleged offenses were serious compared to other homicides. The multiple stab wounds demonstrated a degree of viciousness, and the report noted Petitioner's ability to hide the knife and dispose of K.K.'s bicycle.

*Psychologist Anthony Urquiza*

Psychologist Anthony Urquiza testified as an expert in the area of transfer hearings. Urquiza also prepared a report on Petitioner which was admitted at the hearing. He did not interview Petitioner, but he reviewed various records including school records, probation reports, and DJJ records. He did not review Petitioner's notebooks, but he read reports describing and quoting Petitioner's writings.

Urquiza went through the five criteria and, based on his analysis of them, opined that Petitioner should be transferred to adult court.[8]

---

[8] We recite Urquiza's testimony as to the five criteria in greater detail below (see *post,* part II.B.1).

*DJJ Parole Agent Tiffany Yee*

DJJ parole agent Tiffany Yee supervised Petitioner from May 2019 until his discharge in February 2020. Before he was transferred to her unit, Petitioner had issues including disruptive behavior and violence.

In November 2019, Yee recommended Petitioner's discharge from DJJ. Her recommendation report noted Petitioner's risk assessment for "Aggression/Violence" was high, he "struggled to refrain from aggressive acts," and he "continues to blame and rationalize his behavior in the moment." Her report also stated Petitioner was "able to process the situation before reacting impulsively," and has shown that he can "identify risky behavior and develop solutions to help him stay away from engaging in negative behavior."

Yee testified she understood a youth to be rehabilitated when they showed stability in their daily program by, for example, staying out of fights, interacting appropriately with staff and peers, and completing treatment groups. She believed Petitioner was rehabilitated.

*DJJ Parole Agent Bianca Lopez*

Petitioner presented Bianca Lopez, a DJJ parole agent, to testify about DJJ programs and procedures. A youth committed to DJJ is first evaluated during an intake process, in which DJJ reviews information from probation, completes various assessments, and compiles the information into a report. Based on the information gathered in this intake process, the youth is then transferred to a programming unit and assigned a treatment team composed of a parole agent, a youth counselor, education staff, and, if appropriate, a mental health clinician. DJJ reassesses youths every 30 to 90 days.

A youth's projected release date is determined by the commitment offense. This date may be moved earlier if the youth achieves and maintains

8

a high behavior level. DJJ's rehabilitative goal is to address bad behavior and have the youth take responsibility for their actions. DJJ does not determine whether a youth is rehabilitated, but rather whether the youth has completed the intervention programs and reduced their overall risk.

*Juvenile Court's Ruling*

After finding the People established a prima facie case, the juvenile court considered the five statutory transfer criteria. With respect to the degree of criminal sophistication, the court noted the attack was preplanned, carried out in a secluded location, and involved multiple stab wounds. Petitioner attempted to cover up the crime by burying the body and initially lied to the police about his contacts with the victim. Petitioner successfully concealed the knife from law enforcement and later used the same knife to commit a residential burglary. The court found "most troubling" Petitioner's "continued attraction to violence" primarily demonstrated by his writings before and after the homicide. The court concluded this factor weighed in favor of transfer.

With respect to the likelihood of rehabilitation, the court found a DJJ commitment would be available to Petitioner for approximately three and a half years.[9] The court concluded, "Given [Petitioner's] mixed history at DJJ

---

[9] "Under juvenile justice realignment legislation that went into effect on September 30, 2020, a process to close DJJ and transfer responsibility for youth wards to county governments will begin on July 1, 2021. (§ 736.5, subd. (a), added by Stats. 2020, ch. 337, § 30.)" (*Kevin P., supra,* 57 Cal.App.5th at p. 179, fn. 2.) Pending this closure, "a court may commit a ward who is otherwise eligible to be committed under existing law and in whose case a motion to transfer the minor from juvenile court to a court of criminal jurisdiction was filed." (§ 736.5, subd. (c).) At the time of the transfer order in Petitioner's case, the date for DJJ's closure had not been determined and the juvenile court stated its belief that DJJ would remain

9

and his continued and long-term mental health issues and ongoing attraction to violence, the Court believes that he could not be rehabilitated prior to expiration of the juvenile court's jurisdiction . . . ." This factor therefore weighed in favor of transfer.

With respect to the previous delinquent history factor, the court noted the 2014 battery referral. The court also considered Petitioner's school records from 2009 through 2017, which demonstrated "a pattern of negative behaviors such as non-attendance, fighting, threatening and assaulting other students, class disruption, defiance, harassment, and intimidation." The court discussed Petitioner's "subsequent delinquent conduct" in the 2017 burglary and assault. The court concluded that Petitioner's "past history of explosive and aggressive behavior and his violent conduct in the subsequent home invasion case" weighed in favor of transfer.

As for the prior attempts at rehabilitation factor, the court noted Petitioner refused to participate in services after the 2014 battery and received services for the 2017 burglary only after the homicide. The court concluded that "the lack of services provided prior to the homicide would favor retention here in juvenile court."

With respect to the gravity of the offense, the court incorporated its prior findings on the degree of criminal sophistication. The court found "this was a pre-planned and vicious attack on the victim, intended to kill and take the victim's property, and that this criteri[on] supports a transfer to adult court."

---

open until 2024 or 2025. In May 2021, after the juvenile court's order issued, a statute was enacted directing DJJ's closure in June 2023. (§ 736.5, subd. (e) [enacted by Stats. 2021, ch. 18, § 10, eff. May 14, 2021].) No party has suggested our consideration of this writ petition is impacted by the new legislation.

The court concluded, based on "the totality of the circumstances," that Petitioner would not be amenable to juvenile court treatment and ordered him transferred to a court of criminal jurisdiction.

DISCUSSION

"Appellate review of a juvenile court's ruling on a motion to transfer a minor to criminal court is by a petition for an extraordinary writ.[10]  (Rule 5.770(g).)  We review such rulings for an abuse of discretion.  [Citation.]  The court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo.  [Citation.]  A decision based on insufficient evidence or the court's ' "erroneous understanding of applicable law" ' is subject to reversal." (*Kevin P., supra,* 57 Cal.App.5th at p. 187.)

I.    *"Previous Delinquent History"*

Petitioner argues the "previous delinquent history" criterion is limited to (1) conduct taking place before the alleged offense and (2) conduct resulting in a delinquency petition.  Therefore, Petitioner contends, the juvenile court's consideration of Petitioner's 2017 burglary and the conduct documented in his school records was improper.  We disagree.

" 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.]  The well-established rules for performing this task require us to begin by examining the statutory language, giving it a plain and

---

[10] Petitioner timely filed his writ petition.  (Rule 5.770(g) [petition "must be filed no later than 20 days after the child's first arraignment on an accusatory pleading based on the allegations that led to the transfer of jurisdiction order"].)  We exercised our discretion in favor of granting writ review and issued an order to show cause, in part because the petition raised an issue of first impression about the proper interpretation of section 707 that is likely to recur. (*Hiona v. Superior Court* (2020) 48 Cal.App.5th 866, 871.)

11

commonsense meaning. [Citation.] We do not, however, consider the statutory language in isolation; rather, we look to the statute's entire substance in order to determine its scope and purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the statute's nature and obvious purposes. [Citation.] We must harmonize the statute's various parts by considering it in the context of the statutory framework as a whole. [Citation.] If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history." (*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1106–1107 (*Los Angeles*).)

With respect to this criterion, the statute provides as follows: "(i) The minor's previous delinquent history. [¶] (ii) When evaluating the criterion specified in clause (i), the juvenile court may give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(3)(C).)

The statutory language is ambiguous as to whether "previous" refers to the time before the alleged offense or before the transfer decision. Petitioner argues the meaning becomes clear when we consider the entire statute because other criteria focus on the time of the offense; specifically, one criterion includes consideration of "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health *at the time of the alleged offense*" (§ 707, subd. (c)(3)(A)(ii), italics added), and another criterion is the "circumstances and gravity *of the offense alleged*" (*id.*, subd. (c)(3)(E)(i), italics

12

added).  But the five criteria focus on different areas; that two refer to factors existing at the time of the alleged offense does not mean the rest should also. To the contrary, the statute's express reference to the time of the alleged offense in two instances suggests that where such a reference is omitted— such as in the previous delinquent history criterion—there should be no such limitation.  (*Los Angeles, supra,* 52 Cal.4th at p. 1108 [" ' "It is a settled rule of statutory construction that where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes." ' "].)

Petitioner also points to *People v. Balderas* (1985) 41 Cal.3d 144, which construed a statute providing for consideration of a capital defendant's "prior felony conviction[s]" for purposes of determining whether punishment should be the death penalty or life imprisonment.  (*Id.* at pp. 200–201.)  The court held the provision was "limited to those [convictions] entered *before commission* of the capital crime" because it, like other statutes calling for harsher penalties in such circumstances, had a "presumed rationale . . . that an offender undeterred by his *prior brushes with the law* deserves more severe criminal treatment."  (*Id.* at p. 201.)  But transfer is not a punishment, even if it has been so characterized.  (See *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 810 [transfer has been "characterized as 'the worst punishment the juvenile system is empowered to inflict' "].)  Instead, " 'the sole purpose of the transfer hearing . . . is to determine "whether [the] best interest of the child and of society would be served by the retention of the juvenile court authority over him or whether the juvenile, under all the circumstances, should be transferred to be tried as an adult." ' "  (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 718 (*Chi Ko Wong*).)  Whether a youth

13

was undeterred by "prior brushes with the law" is certainly relevant to this determination, but equally relevant may be conduct occurring after the alleged offense. (See *Balderas,* at p. 202 [holding a different provision of the statute providing for consideration of violent criminal activity was not limited to conduct before the capital offense and had the purpose of showing "defendant's propensity for violence," italics omitted].)

The statutory language is also ambiguous as to whether "delinquent history" and "delinquent behavior" refer to conduct resulting in a delinquency petition or to any delinquent conduct. As Petitioner points out, section 601 and 602 petitions are referred to as delinquency petitions, to distinguish them from section 300 dependency petitions. (*In re W.B.* (2012) 55 Cal.4th 30, 43 ["In the broadest sense, adjudications under section 300 are 'dependency' proceedings, and adjudications under sections 601 and 602 are 'delinquency' proceedings."].) But we are not persuaded that this compels the conclusion that "delinquent history" and "delinquent behavior," for purposes of section 707, refers only to conduct that led to a delinquency petition. (See *In re W.B.,* at p. 42 ["The term[] 'delinquency' . . . ha[s] been employed somewhat loosely in various contexts."].) We note that section 707 directs the transfer report prepared by the probation officer to include the youth's "behavioral patterns" (§ 707, subd. (a)), a phrase which on its face is not limited to behaviors resulting in delinquency petitions.

Because the statutory language is ambiguous, we turn to the legislative history. The five criteria were added in 1975 and were materially identical to the current criteria. (Stats. 1975, ch. 1266, §§ 3–4; *Chi Ko Wong, supra,* 18 Cal.3d at pp. 706–707, fn. 3.) In 2015, the criteria were amended to add factors that may be considered by the juvenile court in evaluating each criterion; these factors also have not materially changed. (Stats. 2015,

14

ch. 234, § 2.)  The legislative history for both of these enactments is silent as to the Legislature's intent with respect to the meaning of "previous" or "delinquent."  However, the legislative history indicates a general intent that juvenile courts have broad discretion to consider all relevant evidence in making the transfer decision.

We begin with Supreme Court cases on section 707 issued before the 1975 enactment of the five criteria.  At that time, the statute authorized transfer upon a finding that " 'the minor is not a fit and proper subject to be dealt with under this chapter.' "  (*Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 714, quoting § 707 (*Jimmy H.*).)  The Supreme Court acknowledged the standard "lack[s] explicit definition," but identified various relevant factors.  (*Id.* at pp. 714–716.)  A subsequent case, in rejecting a challenge to the statute as unconstitutionally vague, noted the factors previously identified by the court and held, "Since proper operation of the Juvenile Court Law is predicated on treating each minor as an individual [citation] any attempt to explicate the standards with greater particularity appears not merely unnecessary but undesirable as likely to set up mechanical categories which the spirit of the law forbids."  (*Donald L. v. Superior Court* (1972) 7 Cal.3d 592, 601.)

It appears that the 1975 amendment was influenced by these then-recent cases.  First, the enacted criteria were quite similar to those identified by the Supreme Court.  (Compare *Jimmy H., supra,* 3 Cal.3d at pp. 714–716 ["[minor's] degree of sophistication especially as the same may relate to criminal activities," "testimony of experts that the minor can be treated by [juvenile] facilities . . . [or] that rehabilitation might require treatment beyond the date of his mandatory discharge," "the minor's behavior pattern including his past record, if any, of delinquency," "the nature of the crime

15

allegedly committed [and] the circumstances and details surrounding its commission"]; with § 707, subd. (a)(3) ["degree of criminal sophistication exhibited by the minor," "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction," "minor's previous delinquent history," "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor," "circumstances and gravity of the offense alleged"].) In addition, as relevant here, "the legislature appears to have considered the warning in *Donald L.* [, *supra,* 7 Cal.3d 592] that particularized standards may create mechanical categories which the spirit of the law forbids and appears to have avoided such mechanized treatment by requiring the judge to consider *all* relevant evidence in the individual case before ordering a minor unfit for juvenile treatment." (*Review of Selected 1975 California Legislation* (1976) 7 Pacific L.J. 237, 487–488.)

The legislative history of the 2015 amendment similarly indicates an intent to maintain judicial discretion to consider all relevant evidence. Most significantly, the factors for the five criteria added by the amendment were expressly made nonexclusive: for each criterion, the statute provides that "the juvenile court may give weight to *any* relevant factor, including, *but not limited to,*" the identified factors. (§ 707, subd. (a)(3)(A)–(E), italics added.) Committee reports underscore this intent, stating: "This bill adds *discretionary, non-exclusive* considerations for the court to weigh in each of the five existing fitness criteria." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 382 (2015–2016 Reg. Sess.) as amended Jul. 8, 2015, p. 5, italics added.) The bill's author stated: " 'It is critical that judges have *the most relevant information and full picture of an individual*, before they make the critical decision of which jurisdiction a juvenile offender should be charged in.' " (Assem. Com. on Public Safety, 3d reading analysis

16

of Sen. Bill No. 382 (2015–2016 Reg. Sess.) as amended Jul. 8, 2015, pp. 4–5, italics added.)  Similarly, the Judicial Council supported the bill, stating it "*enhances judicial discretion . . . .* Judges are free to use their discretion to determine which factors are relevant to each of the five listed criteria and to consider additional factors similar to those listed by SB 382." (Assem. Com. on Public Safety, analysis of Sen. Bill No. 382 (2015–2016 Reg. Sess.) as amended June 15, 2015, p. 8, italics added.)

In sum, the legislative history of the section 707 criteria indicates an overarching intent to grant judges broad discretion to consider all evidence relevant to this inherently case-by-case determination.  Narrowly construing the statutory language to prohibit the juvenile court from considering relevant information would be contrary to this legislative intent.[11]

Petitioner's remaining arguments do not alter our conclusion. Petitioner contends "previous" would be superfluous unless it meant previous to the alleged offense, because otherwise the Legislature could have simply said "delinquent history." (See *In re J.W.* (2002) 29 Cal.4th 200, 209 [principle of statutory construction "that every part of a statute serves a purpose and that nothing is superfluous"].)  To be sure, adding "previous" to "history" is somewhat redundant.  However, "the rule against interpretations that make some parts of a statute surplusage is only a guide and will not be applied if it would defeat legislative intent" (*ibid.*), as it would here. Petitioner also points to the rule of lenity.  " ' "[The rule of lenity] applies 'only if two reasonable interpretations of the statute stand in relative equipoise.' [Citation.]" [Citations.]' [Citations.]  The rule 'has no application where, "as here, a court 'can fairly discern a contrary legislative intent.' " ' "

---

[11] Petitioner does not dispute that the challenged evidence was relevant.

(*People v. Cornett* (2012) 53 Cal.4th 1261, 1271.) The legislative intent here—to allow juvenile courts to consider all relevant evidence in making the transfer decision—is clear and therefore neither the rule against surplusage nor the rule of lenity apply.

Accordingly, the juvenile court did not err in considering Petitioner's 2017 burglary or the behavior documented in his school records.

II. *Substantial Evidence*

Petitioner argues the trial court's finding that Petitioner was not likely to be rehabilitated before the expiration of juvenile court jurisdiction is not supported by substantial evidence. We disagree.

A. *Legal Standard*

"The rehabilitation criterion addresses '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction,' and section 707 identifies 'the minor's potential to grow and mature' as a 'relevant factor' to the evaluation. (§ 707, subd. (a)(3)(B)(i)–(ii).) A juvenile court can retain jurisdiction over a minor committed to DJJ for the offense of murder until the minor reaches age 25. (§§ 607, subd. (b), 707, subd. (b)(1), 1769, subd. (b); [citation].)" (*Kevin P., supra,* 57 Cal.App.5th at p. 198.)

Three cases discussed by the parties are instructive on this criterion. In *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706 (*J.N.*), the minor was vandalizing a rival gang's territory with two other minors when they were approached by an adult rival gang member and one of the other minors shot the rival. (*Id.* at p. 712.) The juvenile court found the criminal sophistication, previous delinquent history, and previous attempts at rehabilitation criteria all weighed against transfer. (*Id.* at pp. 715–720.) With respect to the rehabilitation factor, the probation report found the rehabilitation factor weighed in favor of transfer without any analysis or

18

support, and "the prosecution did not present any expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate J.N. before termination of the juvenile court's jurisdiction. There was no evidence that demonstrated existing programs were unlikely to result in J.N.'s rehabilitation, why they were unlikely to work in this case, or that they would take more than three years to accomplish the task of rehabilitating J.N." (*Id.* at pp. 721–722.) The Court of Appeal held the finding that the rehabilitation criterion weighed in favor of transfer was not supported by substantial evidence. (*Id.* at p. 722.)

In *Kevin P., supra,* 57 Cal.App.5th 173, "[t]he [trial] court determined that the standard seven-year parole consideration period applicable to juveniles committed to DJJ for murder established a minimum rehabilitation period for Kevin, and it found that he was therefore unlikely to be rehabilitated while it retained jurisdiction." (*Id.* at p. 195.) The prosecution's only witness testifying to issues other than the underlying crime was the probation officer who authored the transfer report, and the probation officer testified her opinion that rehabilitation weighed in favor of transfer "was not based on an assessment of Kevin's particular rehabilitative needs," but rather " 'was based solely on the fact that this is a serious offense.' " (*Id.* at pp. 184, 196.) The defense presented expert testimony that "Kevin had good prospects of being rehabilitated in the juvenile system, based on evidence of Kevin's positive characteristics, lack of serious psychological issues, performance in juvenile hall, and low risk of reoffense. The prosecution offered no contrary expert testimony." (*Id.* at p. 200.) The Court of Appeal concluded the rehabilitation finding was not supported by substantial evidence. (*Ibid.*)

In *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009 (*C.S.*), the Court of Appeal found substantial evidence supported the juvenile court's finding that the rehabilitation factor weighed in favor of transfer: "The record shows that C.S. needed substantial programming to ensure he would not return to the gang after being released from DJF, particularly in light of his failure to admit gang membership and his failure to acknowledge responsibility for the offense. The probation report expressed a specific concern about C.S.'s need for gang programming and about C.S.'s need to process his childhood trauma. The probation report also specified that . . . by the time of the transfer hearing, C.S. had just under a year in which to actually participate in DJF programs." (*Id.* at p. 1032.)[12]

B.      *Urquiza's Testimony*

Because many of Petitioner's arguments challenging the sufficiency of the evidence relate to Urquiza's testimony, we begin with a recitation of his opinions followed by a discussion of expert testimony in transfer hearings.

1.      *Additional Background*

Urquiza testified to his opinion on each of the five transfer criteria. With respect to the degree of criminal sophistication, Urquiza opined that Petitioner's planning, digging the grave, possessing the knife, and arranging to meet K.K. were signs of sophistication. Petitioner's attempts to avoid detection also indicated sophistication: burying K.K.'s body in a secluded location, hiding the knife, and initially lying to the police about his use of the social media account and association with K.K.

With respect to whether Petitioner could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, Urquiza categorized delinquent

_____

[12] The Court of Appeal reversed the transfer order on other grounds. (*C.S., supra,* 29 Cal.App.5th at p. 1035.)

youth as either "life-course-persistent or adolescent-limited."  He clarified that the "life-course-persistent" category is "not a diagnosis . . . .  It is a way of describing youth who are both chronically involved in criminal activity and, equally as important, relatively difficult to treat.  The problems that they have are fairly intractable."[13]  Urquiza opined that "a lot of the qualities of a [']life-course-persistent['] youth were the qualities that [Petitioner] had in his history," such as "this long history of being aggressive and defiant," and then engaging in violent behavior.  Urquiza testified that treatment for "life-course-persistent" youth is "really difficult.  They are highly resistant to treatment.  Because you're not just changing a health problem, you're not just changing an issue with regard to substance abuse, or just bad decision making.  You're really changing the way the person views the world, the attitudes, the feelings that they have."

Urquiza considered Petitioner's performance at DJJ.  Initially, Petitioner was "consistently violent and aggressive and defiant."  Petitioner's behavior improved around May 2019, which was "a good prognostic sign."  But his behavioral improvements in an environment "where there's lots of guards and lots of rules and people watching" did not necessarily mean he was likely to be rehabilitated in the approximately four years remaining of juvenile court jurisdiction.  While DJJ had services to address certain problems presented by Petitioner, including some mental health and substance abuse problems, Urquiza opined DJJ was unlikely to successfully treat Petitioner because he appeared to have an "entrenched" delinquency.  Urquiza concluded, "is it possible for him to be rehabilitated prior to the end

_____

[13] Urquiza also referred to this as a "characterological" problem.  For clarity, we will use the term "life-course-persistent" throughout.

21

of his 25th year? Certainly. But I think that is a difficult and unlikely proposition."

With respect to Petitioner's previous delinquent history, Urquiza noted that, although Petitioner had a limited number of arrests, his school records revealed a long history of defiance, aggression, theft, and substance abuse. This demonstrated "a chronic pattern of problem behavior": "for well more than a decade, he has consistently engaged in . . . aggressive, delinquent, defiant behavior. Suddenly making a transition away from that is a really difficult thing to do."

As for previous attempts at juvenile court rehabilitation, Urquiza noted that Petitioner refused to participate in mediation after his 2014 referral.

Finally, Urquiza opined the gravity of Petitioner's alleged offense was significant: a planned, unprovoked killing in which Petitioner acted alone.

2. *Expert Testimony in Transfer Hearings*

As an initial matter, we question the utility of substantial portions of Urquiza's testimony about criteria other than the rehabilitation criterion. Evidence Code section 801, subdivision (a) limits expert testimony to matters "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."[14] " ' " 'Where the [trier of fact] is just as competent as the expert to consider and weigh the evidence and draw the necessary

---

[14] We acknowledge the Supreme Court has stated, "It is clear that the very nature of the fitness hearing precludes imposition of strict evidentiary standards. . . . Thus it has been said that '[t]here appear to be no limitations upon the evidence that the court may consider at the remand or referral hearing, other than the basic tests of relevancy and materiality to the issue presented.' " (*Chi Ko Wong, supra,* 18 Cal.3d at pp. 717–718.) We need not decide whether Evidence Code section 801 applies in transfer hearings because even if it does not, its provisions are consistent with the requirements of relevance and materiality.

conclusions, then the need for expert testimony evaporates.' " ' " (*Nevarrez v. San Marino Skilled Nursing & Wellness Centre, LLC* (2013) 221 Cal.App.4th 102, 122; see also *People v. Alcala* (1992) 4 Cal.4th 742, 781 [expert testimony unnecessary to evaluate witness's claimed loss of memory where the trial court could make availability determination "based on its own close observation of [the witness's] demeanor and responses"].) Urquiza's opinions regarding Petitioner's criminal sophistication and the circumstances and gravity of the offense were not beyond the common experience of the juvenile court. (See *Kevin P., supra,* 57 Cal.App.5th at pp. 187–188, 190 [minor presented expert opinion testimony about whether the gravity and circumstances of the alleged offense criterion weighed for or against transfer but did "not offer any authority for the proposition that expert testimony—or any other evidence beyond that bearing on what happened during the crime—is required to evaluate this criterion"].)

With respect to the rehabilitation criterion, courts have consistently approved expert testimony in transfer hearings "on the issue of the availability of treatment programs in the juvenile court system and the amenability of the minor to those programs," including whether " 'rehabilitation might require treatment beyond the date of his mandatory discharge.' " (*J.N., supra,* 23 Cal.App.5th at pp. 721–722; see also *Chi Ko Wong, supra,* 18 Cal.3d at p. 717 [appropriate evidence at transfer hearing includes "expert testimony on the minor's amenability to treatment and whether rehabilitation might require treatment beyond the time during which he may be under the control of the court"]; *Jimmy H., supra,* 3 Cal.3d at pp. 714–715 [appropriate evidence includes "testimony of experts that the minor can be treated by [juvenile] facilities" and "expert[] testi[mony] that rehabilitation might require treatment beyond the date of his mandatory

discharge"].)  For example, in *C.S.,* a psychologist testified about the minor's childhood history, mental health diagnoses, and conduct during a previous DJJ commitment; relevant programs at DJJ; and his opinion as to whether the minor could be rehabilitated within the time remaining under juvenile court jurisdiction.  (*C.S., supra,* 29 Cal.App.5th at pp. 1019–1020.)

Urquiza's testimony regarding the categories "life-course-persistent" and "adolescent limited" was not the type of testimony envisioned in *J.N.* and *Jimmy H*.  As Petitioner argues, Urquiza failed to establish the categories are generally accepted among adolescent psychologists.[15]  (See Evid. Code, § 801, subd. (b) [expert opinion must be "[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates"]; *People v. Ruiz* (1990) 222 Cal.App.3d 1241, 1243, 1246 ["there must be some showing that the material on which the expert bases his or her opinion—here the profiles of the primary types of pedophile—is reliable," but "[t]here was no evidence that the scientific community had developed any standard profile of a pedophile"].)  Moreover, Urquiza appeared to use the term "life-course-persistent" simply as a shorthand for what he identified as the characteristics of a youth in that category: a long history of aggressive, defiant behavior (with possibly other problems like substance abuse or mental health issues) that becomes "entrenched" and eventually turns to violent behavior.  Placing a dubious label on a set of identifiable characteristics easily understood by a lay person is of little assistance to the juvenile court.

---

[15] Other than a reference to a 2018 article by Terrie E. Moffitt—which was neither explained nor submitted into evidence—the record is silent as to how the adolescent psychology community views the categories.

24

In sum, while some of Urquiza's testimony was relevant and material, a substantial portion of it was not. " 'The expert witness is the only kind of witness who is permitted to reflect, opine, and pontificate, in language as conclusory as he [or she] may wish . . . . [¶] Once we recognize the expert witness for what he [or she] is, an unusually privileged interloper, it becomes apparent why we must limit just how far the interloping may go.' " (*People v. Johnson* (1993) 19 Cal.App.4th 778, 789–790.)

C.     *Analysis*

Despite our rejection of Urquiza's "life-course-persistent" testimony, Petitioner's substantial evidence challenge to the juvenile court's rehabilitation finding fails.

First, Petitioner did not object to the testimony below. (See *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 564 [appellant forfeited objection that respondent's expert "employed a legally impermissible methodology" by failing to object at trial and therefore depriving respondent of "the opportunity to meet that objection by attempting to correct the alleged infirmity"].)  Second, as noted above, Urquiza's use of the term "life-course-persistent" was effectively a way of noting a group of characteristics that Petitioner demonstrably had: a history of aggressive behavior that evolved into violent conduct.  Third, and most significantly, even if we ignore Petitioner's forfeiture, Urquiza's testimony that Petitioner was a "life-course-persistent" delinquent was not the only evidence in the record relevant to the rehabilitation criterion.  "We consider the entire record to determine whether substantial evidence supports the juvenile court's findings." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.)  Indeed, the juvenile court itself identified the evidence underlying its rehabilitation finding as Petitioner's "mixed history at DJJ and his continued

25

and long-term mental health issues and ongoing attraction to violence."
Substantial evidence supports each of these subsidiary findings.

Petitioner's "mixed history at DJJ" is undisputed. Petitioner
emphasizes the evidence that his behavior improved after an initial period
and argues this demonstrates he was likely to be rehabilitated. The juvenile
court was entitled to discount Yee's testimony that Petitioner was
rehabilitated, in light of Lopez's testimony that DJJ did not determine
whether youths were rehabilitated. The juvenile court could also reasonably
credit Urquiza's testimony that, particularly in light of Petitioner's years of
aggressive and defiant conduct, his recent turnaround only demonstrated he
could perform well in a highly structured environment.

Petitioner does not dispute the juvenile court's finding that he had
"long-term mental health issues."

Finally, the juvenile court's finding that Petitioner had an "ongoing
attraction to violence" was supported both by evidence of his years-long
aggressive conduct and by his violent writings.[16] Petitioner challenges this
finding, arguing most of his writings were undated and written before
January 2019. The writings were recovered by police in 2016, 2017, and
2018. This—in addition to the evidence of Petitioner's long history of
aggressive conduct—is sufficient to support the finding of an ongoing

---

[16] Petitioner challenges Urquiza's testimony about Petitioner's writings
because he reviewed only quotes and excerpts of the writings, not the original
writings themselves. Petitioner identifies no quotes or excerpts in the reports
reviewed by Urquiza that were erroneous or misleading, and therefore has
not established that Urquiza's reliance on the reports rendered his testimony
unreliable. Moreover, the original writings were admitted into evidence and
reviewed by the juvenile court. In part III, *post,* we consider and reject
Petitioner's challenge to the admissibility of his writings.

26

attraction to violence, even absent evidence of additional writings in 2019 and 2020.

Petitioner also argues there was insufficient evidence of the precise services needed to rehabilitate Petitioner, the programming offered at DJJ, and why Petitioner would not benefit from DJJ programming. A similar argument was raised in *C.S.* (See *C.S., supra,* 29 Cal.App.5th at p. 1031 [youth challenged rehabilitation finding on the ground that "the district attorney failed to 'provide any details about available programs' at [DJJ] and whether those programs would rehabilitate him"].) Here, as in *C.S.,* there was ample evidence of Petitioner's need for substantial programming in light of his years-long record of aggressive behavior and his attraction to violence. There was evidence of the programming available to Petitioner at DJJ: Parole Agent Yee testified he would receive the same programming as he had during his commitment for the 2017 burglary. The juvenile court could reasonably find that, despite Petitioner's behavioral improvements during his time at DJJ, the likelihood of rehabilitation factor weighed in favor of transfer. This case is easily distinguished from *J.N.* and *Kevin P.,* where little to no supporting evidence was presented.

In sum, there was sufficient evidence to support the juvenile court's finding that Petitioner was not likely to be rehabilitated before the expiration of juvenile court jurisdiction.

III.   *Admission of Petitioner's Writings*

Petitioner argues the juvenile court erred in admitting his writings. We reject the challenge.[17]

Many of the admitted writings rhyme and appear to be lyrics.  We accept, for purposes of this appeal, that the writings were rap lyrics, poetry, or a similar expressive writing.  Petitioner points to authority holding such writings lack probative value: "Absent some meaningful method to determine which lyrics represent real versus made up events, or some persuasive basis to construe specific lyrics literally, the probative value of lyrics as evidence of their literal truth is minimal." (*People v. Coneal* (2019) 41 Cal.App.5th 951, 968 (*Coneal*); see also *People v. Melendez* (2016) 2 Cal.5th 1, 24 (*Melendez*) [writing properly excluded where "it appears the words were merely rap lyrics" and "[n]o reason appears to assume they relate actual events"].)

The probative value of evidence depends on the fact in dispute.  (Evid. Code, § 210 [" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."].)  In a criminal trial or juvenile jurisdictional hearing, the ultimate disputed fact is whether the defendant or minor committed the alleged act.  Such was the case in the authority relied on by Petitioner, and the writings were therefore being offered as evidence of their literal truth; in other words, that the things written about had in fact

---

[17] An evidentiary ruling "is not ordinarily subject to review by writ [citation] and typically is reviewed for abuse of discretion on appeal." (*Aas v. Superior Court* (2000) 24 Cal.4th 627, 634.)  However, because transfer decisions are neither directly appealable nor reviewable on appeal from a criminal judgment of conviction (rule 5.770(g); *Chi Ko Wong, supra,* 18 Cal.3d at pp. 710–712), writ review of the challenged evidentiary ruling rendered in the context of the transfer ruling appears appropriate.  The People do not contend otherwise.

happened.  (*Coneal, supra,* 41 Cal.App.5th at p. 968 [in murder trial, "lyrics describing or advocating violence [admitted] as evidence that the rapper in fact committed and/or advocated such acts"]; *Melendez, supra,* 2 Cal.5th at pp. 22–24 [in murder trial, lyrics by codefendant purportedly confessing to the murder offered as evidence that codefendant in fact committed the murder]; *In re George T.* (2004) 33 Cal.4th 620, 624 [in § 602 proceeding, minor's poem offered as evidence that minor made a criminal threat].)

In contrast, in a transfer hearing, " 'the sole question is whether [the youth] would be amenable to treatment in the event that he [or she] is ultimately adjudged a ward of the court.' " (*Kevin P., supra,* 57 Cal.App.5th at p. 186.)  Evidence of the youth's conduct is relevant to this determination, but so is evidence of the youth's mental and emotional state and related characteristics.  (See § 707, subd. (a)(3) [criteria and factors include minor's "intellectual capacity," "mental[] and emotional health at the time of the alleged offense," "impetuosity," "potential to grow and mature," "mental and emotional development"].)  Expressive writings, while generally not evidence of their literal truth, may well be evidence of the writer's mental and emotional state.  (See *In re George T., supra,* 33 Cal.4th at p. 638 [" 'Literature illuminates who "we" are: the repertory of selves we harbor within, the countless feelings we experience but never express or perhaps even acknowledge . . . .' "].)

The juvenile court so concluded here.  The court did not admit the writings as evidence of their literal truth, but rather as evidence of Petitioner's "mental state."[18]  In its decision, the court relied on the writings

---

[18] Although trial counsel did not formally object to the writings, he did express concern about them and the juvenile court construed the concern as an objection and overruled it.  The People do not argue Petitioner forfeited the claim below by failing to object.  Accordingly, we consider it on its merits.

as evidence of Petitioner's "continued attraction to violence": "Prior to the homicide charge in front of the Court, the minor's own writings show many conversations about violence and killing people with knives and putting bodies into graves;" "It also appears that these writings and thoughts of violence continued on even after he was incarcerated at DJJ. A search of his cell was conducted at DJJ, and writings, drawings, and journals were confiscated by investigators which showed continued thoughts of violence, gang involvement, and specific references to the victim." While violent lyrics written over multiple years may be inadmissible to prove the writer committed the acts described in the lyrics, the writings may properly be admitted in a transfer hearing as evidence that the writer has an ongoing interest in and attraction to violence. The admission of the writings for this purpose was not an abuse of discretion.

IV.  *Ineffective Assistance of Counsel*

Petitioner argues his trial counsel provided ineffective assistance by failing to object to the delay in filing the underlying petition and to seek dismissal of either the petition or the transfer motion. We conclude that, on this record, Petitioner has failed to establish the claim.[19]

---

[19] We assume, without deciding, that ineffective assistance of counsel claims are available on mandamus review.

A.    *Additional Background*

As set forth in the factual background, *ante,* as of December 2018, police had found K.K.'s DNA on Petitioner's knife, learned that Petitioner's friend saw Petitioner on what he thought was K.K.'s bicycle shortly after K.K. went missing, and heard Do.C.'s statement that Petitioner confessed to the murder.  The delinquency petition was not filed until more than a year later, in March 2020.

During argument on the transfer petition, Petitioner's counsel argued: "It doesn't seem quite right, Your Honor, that in a situation in which a very important consideration should be amenability to treatment, that the prosecution is arguing that there isn't enough time now when we learned in the evidence yesterday that by August and September 2018 there was no reason to doubt that [Petitioner] had committed murder on [K.K.], and when, by December 24th and 25th of 2018, [Do.C.] had added his information . . . . [¶] So what happens to that now two years?  It's been two years since the conclusion was that [Petitioner] was responsible for the murder.  The indications are, He's in DJJ.  He's staying until 2022.  We're in no rush. Well, that kind of flies in the face of then saying delaying charging [Petitioner] with this offense until he's on the eve of his release from DJJ shouldn't play into this in some way and in some fashion. [¶] [Petitioner] has, and we will address that issue in — whether it's here in the juvenile court or the adult court at a later time with regard to that pre-charge delay.  But for these purposes it just seems somehow twisted that this wasn't brought at a time that was more germane with regard to what efforts there were in terms of amenability for treatment."

B.    *Analysis*

"The due process right to effective assistance of counsel extends to minors in juvenile delinquency proceedings." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1528.)  " 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.  [Citations.]  If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.  [Citation.]  Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1189 (*Carter*).)

" '[D]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.  A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay.  The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.' " (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250.)  "Purposeful delay to gain an advantage is totally

unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Id.* at p. 1256.) "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. " . . . [T]he difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay.' " (*Id.* at pp. 1256–1257.)

We are troubled by the implication arising from the record that, although the People had ample evidence by late 2018, they waited to file a petition until Petitioner was scheduled for release from DJJ in early 2020. As Petitioner argues, the amount of time a youth will be subject to DJJ jurisdiction can be a significant factor in a transfer decision. Thus, prosecutors should make efforts to promptly file petitions alleging a minor has committed a transferrable offense.

However, the current record is insufficient to establish an ineffective assistance of counsel claim. Trial counsel may have made a tactical decision not to raise the claim at the transfer hearing. For example, counsel may have concluded that the court would not find dismissing the transfer motion an appropriate remedy for unreasonable delay, and that counsel could seek dismissal of the underlying petition or criminal charges at a subsequent time. Counsel may also have believed the juvenile court would have found the delay until December 2018 justified by the ongoing investigation, and would have further found no significant prejudice with respect to the transfer motion because a little over a year more of juvenile court jurisdiction would not have changed the court's decision, especially because the favorable evidence about Petitioner's improved behavior at DJJ was only available

33

because of the delay.  Where, as here, the record is insufficient to establish an ineffective assistance of counsel claim, the appropriate avenue to develop the record is to file a habeas petition with sufficient allegations to state a prima facie case.  (See *Carter, supra,* 36 Cal.4th at p. 1189; see also *In re Steele* (2004) 32 Cal.4th 682, 692 [habeas petition should be initiated in superior court]; *In re Hillery* (1962) 202 Cal.App.2d 293, 294 [same].)

## DISPOSITION

The petition for writ of mandate is denied.

_____

Simons, J.

WE CONCUR:


_____

Jackson, P. J.


_____

Needham, J.




A162937

**D.C. v. Superior Court (A162937)**

Trial Judge:        Hon. Ken J. Gnoss

Trial Court:        Sonoma County

Attorneys:

      Sarah Javaheri for Petitioner.

      Rob Bonta, Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Amit Kurlekar, Deputy Attorney General, Jalem Z. Peguero, Deputy Attorney General  for Real Party in Interest.